Case number 24-1050 et al. Commonwealth of Kentucky et al petitioners v. Environmental Protection Agency and Michael S. Reagan in his official capacity as administrator of the U. S. Environmental Protection Agency. Mr. Lynn for the industry petitioners, Mr. Abramson for the state petitioners, Ms. Buckley for the respondents, part 1 and 2 of EPA's brief. And Ms. Saint-Romain for the respondents, parts 3 and 4 of EPA's brief for state interveners. Good morning. It may please the court. Albert Lynn on behalf of the industry petitioners. I'm sharing time today with Mr. Abramson from the Kentucky AG's office, but only I plan to do rebuttal for our side and I hope to reserve three minutes for that purpose. With my opening time, I'd like to focus on the question of EPA's authority and begin with some important table setting. Specifically, I think the briefing has both sharpened and narrowed the dispute over EPA's authority. Although there was substantial briefing over the first sentence of 109-D1, particularly the meaning of the word appropriate, everyone agrees that is not before this court. EPA has acknowledged that this action was not premised on any authority granted by that sentence and thus cannot and does not seek to defend the action on that ground. What remains is EPA's claim that it has either implicit authority or authority granted by the second sentence of 109-D1 to reconsider a NAAQS determination without conducting a thorough review, to quote, of the air quality criteria or frankly any review at all. That's at page 42 of their brief, in its discretion at any time. Among other problems, we think that claimed authority, which EPA itself admits is a question of first impression, simply does not exist. Now, if I could start first, I'd start with the claim that EPA has implicit authority to reconsider NAAQS decisions. As a threshold matter, it's not clear to us that EPA is really relying on this authority. It says a number of times in its brief that it is relying on the second sentence, the authority of the second sentence of section 109-D1. And I think that's because, as this court has explained in a series of cases, Congress can displace an agency's implicit reconsideration authority. And it can do that where Congress creates a statutory mechanism capable of rectifying a mistaken action or sufficient to that task. That's the American method. Well, you seem to, well, obviously over this five-year cycle, there's a thorough review required. Yes, Your Honor. You agree with that. And then you seem to agree that EPA can conduct an off-cycle review. You just disagree with how it is to come to that determination? That is correct, Your Honor. Okay. But think about it this way, too. Under your theory, you believe the off-cycle review has to have a thorough review? Correct, Your Honor. Yes. Okay. But if you already have to go through almost five years of conducting a thorough review just to potentially set a new standard, and then you're also going to say that on an off-cycle review you need a thorough review, that timing issue doesn't seem to really work out because it already takes so many years just to get to the new standard. I understand, Your Honor. I think there's a practical question of how long a thorough review may or may not take. I mean, let's say it took two years. You could do an off-cycle review that takes another two years, and then you could pick up another five-year one. Has that ever happened in history? Afterwards. They've often been slower than five years. Have they ever been? Not that I'm aware of, Your Honor. So it's not a realistic reading. Yes, Your Honor, but I do think that the text, that's what the text requires. I think that's what Congress had in mind. I mean, if we go to the second sentence. What does the second sentence in 7409B1 mean? I think everyone agrees there that that's the one about the manner, Your Honor. I think everyone agrees that's about requiring notice and comment. The EPA says that itself. It certainly says it can be revised. Yes, Your Honor. The same manner as promulgated. Yes, Your Honor. Promulgated notice and comment rulemaking. Yes. That certainly happened here. Yes, yes, and we're not contesting that there was no notice and comment. Right. So the revision of the standards here fully comported with 7409B1. With the requirements of 109B1, yes. But as EPA says on their brief. It doesn't require anything like thorough or anything else for revisions. It's just the same. It's talking about the manner, which you have to do when you're revising these primary NAC standards here. Correct, Your Honor. Does it say thorough? No, it doesn't. It just says same manner, which was complied with. So why isn't that the end of the story? Because we believe that that, and I think EPA agrees with that, that that is an additional requirement. So I think they don't look to that provision for authority because I think they agree with us. If you look at page 34 of their brief, that that is about a notice and comment requirement. It does not grant them the discretion they're looking for. They haven't argued that that provision is what gives them the authority. They say what gives them the authority is the second sentence of 109B1. Again, I think the reason for that is they – I just want to understand one thing. So D1 did not come without the statute originally. It came in in –  – 77 or 79, right? Yes. Okay. So between 70 and – sorry, is it 79 or 77? My brain's not remembering which year the D1 came in. I don't remember either, Your Honor. I'm sorry. So it's like 77. Okay. So prior to that time, did they have no authority? They could revise at any time. Yes, Your Honor. They – I think – well, so they have the implicit authority to reconsider. No, under D1. So prior to 77 amendments when D1 comes in. Yes. They had the obligation to promulgate for present purposes primary and acts, and they had the authority to revise them at any time as long as they did it in the same manner, notice and comment rulemaking. Is that correct? Yes, Your Honor. So if this were a 1976 case, what they did here would be perfectly law. I think the – in the period between – that we're talking about before 109-D1 came in, they would have had the implicit authority to reconsider. You keep saying implicit. It's explicit. It's right here. They can be – they may be revised as long as done in this manner. That's not implicit. That's explicit in the statutory text of B1. I'm not articulating between B and D. Let me know. B as in boy one. Of course, Your Honor. So I guess I would give you – Is that right? So for 1976, this would all be perfectly law. If it were 1976, this would be fine because they did notice and comment. So what in D1 tells us that it was taking away that authority from B1? Because that's not normally how we read subsequent legislation. Well, I think there's two answers to that, Your Honor. And the first one is that I think, again, I don't think that's the way EPA reads it, I think. Well, we're totally – you know, it doesn't matter how they read statutes anymore. So I agree from my viewpoint. That is correct, Your Honor. But they are still bound by Chenery. They're still bound – That's a very open question. So whether Chenery applies to a basic question of statutory authority as opposed to decision-making. I think that's fair, Your Honor. But I don't think that that question has been raised in this case. I think they – I'm just asking you just as a textual matter. So let's put aside what they said or not said. Just reading the statute up front textually, they had the authority to do what they did here under B1. Full stop. D1 doesn't say anything about taking away that authority. No, Your Honor. I don't think it took – If we read it to confound that authority by putting an impossible framework that you said has never worked, inconceivable. It's not like it's getting easier. It's probably getting harder over time. It's going to work. Your Honor, I guess – There's nothing in the text that tells me about that. Yes, Your Honor. And so my second answer, other than Chenery, is I would say we don't read 109-D1 as taking away what B1 is referring to. I think it adds additional requirements. Why? It doesn't – I mean, this is your argument from your reply brief that the second sentence doesn't talk about standards other than new standards. It doesn't talk about revising standards. It talks about revising criteria. And, of course, when you revise criteria, you would then go to B1 to revise the standards. Would you not? I mean, this is your argument in your reply brief that the second sentence that they're relying on doesn't talk about revising standards. That is correct, Your Honor. It doesn't. So it can't be altering the authority to revise standards under B1. Well, the way we read the second sentence is that it is not an independent grant of authority, that it is tied to the first sentence of 109-D1, and that that grant of the ability to revise more often than every five years incorporates all the requirements and powers that are discussed in the first sentence of 109-D1. So I think – Yes, Your Honor. Let me see if I understand how this works as you explain. What's an example, first of all, of a criterion? What's it look like? Of an air quality criteria? Yeah. The way he explains it is it's really – it's a document that talks about the scientific studies and – That's good enough. Yes. And from that, they derive a standard that they deem sufficient to meet the statutory margin of error. Yes, Your Honor. Now, this argument on your reply brief, that's 14, says look at the statute, right? The second sentence talks about reviewing and revising the criteria. Yes, Your Honor. As discussed. Or promulgating new standards, right? Yes. But here we have the agency revising the standard. That's right. Not revising a criterion and not promulgating a new standard. Yes, it's revising existing standards. Now, you surfaced this, which seems like a very sensible observation as a starting point, but then diminished it, I guess, as being not the better interpretation in your view. Why is that? We don't think that Congress would have written the second sentence in that paragraph that just addressed those three things, reviewing criteria, revising criteria, and promulgating new standards. Even though that's the way it's written? Yes. We think that those – we think that those nine words that we're talking about are really just statutory shorthand for the much more complex mouthful that is in the first sentence. The Supreme Court recognized in the Kellogg-Brown case that Congress will sometimes use statutory shorthand as a succinct way to refer to something that is much lengthier and much more complex. And that first sentence says that at every five years, EPA shall conduct a thorough review of the air quality criteria and the standards, and then it shall review, revise them as may be appropriate. So I take it then, the second sentence, what you say about the second sentence on page 14 is not your alternative argument? No. Our argument – we are saying – Yes, if this court disagrees with us that the two sentences are interlinked and that the second sentence is merely a statutory shorthand reference that modifies the timing requirements, we were saying, if you think they can be decoupled, then it does not give EPA the authority they are asking for. But we do not think that is the way you should read it. We think the best reading of those two sentences is that one is simply referring back to the other and making sure that it is clear that EPA has the authority to do what is required in that first sentence more often. Do you want to live and die on the first sentence? Live or die on the first sentence? We believe that the first sentence is what imposes requirements on their revision. And we think the question before this court, which is what EPA has said, is do they have independent authority granted by the second sentence of 109D1? That is the only basis on which they have defended their rule. And so I think if this court – I'm sorry, Your Honor. I didn't want to step on you. Well, it just seemed to me that the interpretation that surfaced on page 14 of the flag brief suggests that if the agency determines that there's new science and so on, it can revise the criteria or wait. In other words, if there's a five-year period of repose, new things may come along, revisions may occur after two years, but the standard can't be changed until the fifth year. So there's some repose for the industry. Yes, Your Honor. I think that is one way. We think if you're going to decouple the two sentences, that is the only reading of the second sentence that makes sense, which is that in between the five-year periods, they can review and revise the criteria. They could promulgate new standards if there's some new criteria pollutant, right, for which there has been no preexisting standard. But as to the revision of existing standards, that is governed by – And it is definitely nullifying D1. And yet the sentence that you are putting so much weight on doesn't talk anywhere. As you argued in reply brief, it does not talk about revising standards. It only talks about new standards. And so it's not only that you want us to read this as a shorthand for the very long sentence that preceded it, but then we also have to write in review and revise criteria or standards or promulgate new standards. And on top of reading that in, we have to say that was meant to vitiate, nullify the plain text of B1. I mean, there was no reason to put standards in the second revision of standards there because they already had that authority under B1, but they needed to have the ability to look at the criteria. And then once they found criteria, if they found that suddenly something is toxic and killing people, and they need to address it right away, the notion they have to sit around waiting three years because Congress somehow implicitly nullifies the authority to act and revise standards under B1 is quite an extraordinary statutory interpretation exercise. Here's my answer to B1, Your Honor. I don't read B1 as a grant of the authority to revise. I think it is imposing a requirement on the manner in which the revision can occur. Okay, why would you prescribe, why in 1970 would they say how they can revise them if they couldn't revise them? I think the revision authority was implicit. I don't, may be revised, and here's how. Why is that not the better reading of the sentence? I don't understand why they would have an explicit condition on an implicit authority, and if I read may be revised as they may be revised, and here's how. Isn't that the more natural reading than to assume that they went explicitly to tell them how to do something they weren't even sure they had the authority to do? I don't think so, Your Honor. I mean, so if I could take a step back again. I think Congress understood that EPA has the authority to revisit what it has done before. I think this court recognized that. That's in the implicit authority cases that I've discussed, American Methil, New Jersey. So I think Congress recognized that promulgating that standard, EPA could revise them. I think what it was saying in 109B, one is it says they may be revised in this manner. I think it's just talking about the manner in which that can be done, and it is requiring the same manner, which is the notice and comment that was prescribed in 109B. If you look at the last sentence, the administrator may review and revise criteria or promulgate new standards earlier or more frequently than required under this paragraph. You're not giving any context to timing. Well, I think – I'm sorry if I'm not understanding your question, Your Honor. I think the earlier, more frequently in the second sentence of 109D1 is referring to the five-year intervals that are discussed in the first sentence of 109D1. I think everyone agrees on that. Okay, but it says review and revise in the last sentence. Yes, it is talking about reviewing and revise. It says review and revise criteria or promulgate new standards. And so as I was discussing with Judge Ginsburg, I think with that there's two potential ways. But the point of revising the criteria is to promulgate essentially a new standard or revise the standard. Yes, Your Honor, except – so I think there's two ways to read that second sentence, right? The first is that it is, I think as we intend, it is a shorthand in reference to all the stuff that's discussed in the first sentence. That first sentence talks about four potential actions. The revision – the review of criteria, the revision of criteria, the revision of standards, and promulgating new standards. Four things, right? Reviewing criteria, revising criteria, revising existing standards, and promulgating new standards. So one way to read the second – Promulgating a standard is based on criteria. Yes, Your Honor. Okay, so you're skipping over when you say revision of standard without looking at the criteria. No, Your Honor, I'm sorry. I'm just trying to parse whether the two are focused on the text of the second sentence. Because I think, again, I think there's two ways to read the two sentences in 1091. One is that they are coupled, and one is that they are decoupled. EPA's position is that they are decoupled. Our position is that they are coupled. I think the reason – and what I'm trying to get at is when you look at the first sentence, it talks about four potential actions. Reviewing criteria, revising criteria, reviewing existing standards, and promulgating new standards. As I was discussing with Judge Ginsburg, the second sentence only talks about three of those things. Reviewing criteria, revising criteria, and promulgating new standards. And so one way to read those two sentences is that they are independent. And they don't – they're not coupled together. If that's true, the second sentence only grants authority to do three things. Review criteria, revise criteria, and promulgate new standards. If you're taking a strict textual interpretation, which is what the EPA wants to do, you are stuck with just those three actions in the second sentence. Which makes perfect sense because there's already a separate statutory authority in the same section for revising the standards. Your Honor, if you read 109B1 as granting the authority to revise, I think when Congress legislates, they understand that the agency has the ability to revise what they have done previously. And I think all 109B1 was doing is dictating the manner in which that revision may be done, not granting the authority. Because I think the authority was present as an implicit matter. And I think all it was doing in 109B1 was – It shouldn't be present. I mean, this is the original statute, 1970. There wouldn't have been any implicit at the time Congress wrote this sentence. This was creating the authority. May be revised.  Yes, but, Your Honor, I think – I mean, every case – It's your best case that language like this, that something may be done in a manner, is only explicit as to the manner, but implicit to whether it may be done at all. I don't have a case for you, Your Honor. What I have – A grammatical example in plain English in which may be revised in a manner, or may be, pick your other verb, in a manner, doesn't give you both the authority to do the thing that you may do, as well as telling you how to do it. Well, I think the best textual answer to you, Your Honor, would be that you would say may be revised and done so in this manner. I think the fact that there is – We just don't ding Congress for not putting more words in, because that's just unneeded words. May be revised in a manner. Right? My two best answers for you, Your Honor, are one, that is not the authority that EPA has claimed here. My car may be repaired. I tell the auto mechanics, my car may be repaired in the same manner it was originally designed. And I leave my car. That does not mean they have to sit around wondering if they can actually repair the car. Your Honor, I think, again, it starts from what is the premise that we're starting from? Did EPA have authority to revise as an implicit matter or not? And I think – No, no, no. I'm sorry. I don't think we're – Maybe I'm just clearly misunderstanding something here. I'm starting from 1970, the original statute, which has not been amended. And if I'm reading it as explicitly granting them the authority to revise standards. And it's the only way to explain why in D1 they left – You said there's four things in the first sentence, three in the second. Which one did they leave out? Revision. Which is already addressed here. And it makes perfect sense for the purpose of the statute. As Judge Childs was saying, imagine they're able to revise the criteria as thoroughly as you want, and they discover suddenly a new toxic pollutant that is killing people. And your reading of this statute that you propose, despite its public health animating force, would be that EPA would have to sit around, wringing its hands for two or three years, going, this is horrible, this is horrible, there's nothing we can do, because we can't yet revise the standard. If we did revise it, we would know how to do it and notice and comment, but Congress hasn't told us we can do it. So – It's an unnatural reading of the statute. To your hypothetical as to whether there's a new toxic pollutant, I think then they would be promulgating a new standard, so we'd be talking about something – A fact, yes, would be your hypothetical. I'm not a scientist at all. Let me try this for you. I think if Congress had enacted the Clean Air Act of 1970 had not included maybe revised in a manner promulgated, in the same manner as promulgated, EPA would have the authority to revise. Because I think – Can you say that one more time? Let's say we strike one of that sentence that you and I have been discussing. Maybe revised in the same manner as promulgated. If that was not there, EPA would still have the authority to revise existing standards. And the reason for that is that, as this court has said, when Congress grants EPA the authority to do something, it also has the implicit authority to reconsider it. That's what this court said in the American Methil case. That's what this court said in the New Jersey case, in Ivy Sports. So if we didn't have that sentence, they would have had the authority to revise a standard that they promulgated. So that, I think, is where we're starting from. And then so if they already have the implicit authority, the way I understand that sentence is it wasn't Congress granting it. It was putting – restricting the manner. I think that's your rationale. How do I know Congress just wanted to be explicit? Sometimes Congress – it is not uncommon to find in the U.S. Codes, say, Congress granting authorities, giving powers that agencies would implicitly have. Right? Yes, there are. No, it's not. Yes, right. No, Congress is not. And so we got work here. It's not always particularly clear. The only thing that explains why they didn't bother to put revised standard up here in D1. Otherwise, it's just – because you can't do your shorthand. I mean, basic statutory construction says we cannot do your shorthand. That second sentence brings in everything from the first sentence. Because then we would have to say that a revised standard is either covered by criteria, which we know it's not. Those are specialized terms in the statute. Or we would have to say a revised standard is covered by a new standard, but we know that's not true because these are specialized words in the statute. So there's nowhere under your reading to put all of the first sentence in the second sentence because we did a minimum. We'd have to take out revised standards. Your Honor, I think the way you would do it is you would understand that those nine words are shorthand. But when they don't shorthand, we could do that if Congress used one generalized word, the foregoing powers, something like that. As you said, it would be – it would seem strange when Congress said, I'm discussing four things, and then does another sentence and says, okay. Now, as to three of those things, here's an additional provision. And we have pretty settled statutory construction principles that when Congress deliberately includes and excludes language even less close than this, sentences right next to each other, we assume it was intentional. Yes, Your Honor, I understand that. I do think that the Supreme Court has recognized that you can have shorthand. I get that this is perhaps a less than artful form of shorthand. It would be in the contradiction of that well-established statutory construction principle. And when Congress intentionally omits language that it included in the sentence right before it, that we assume that that was intentional, correct? I think that's right, Your Honor. But again, so we don't think – and I would be the first to admit to you, I don't think 1091 is drafted in the way that I necessarily would have drafted it. But that's the best way that I can make sense of the two sentences. And, Your Honor, if I could add one other point. If you take the position – if you agree with the position that EPA is taking, which is that they can revise existing standards at any time and that they have this freewheeling authority, Your Honor, if you read it into 109B1, it's just a grant of authority to revise. There's no requirement. Oh, it's not just a grant of authority to revise. It has to be done in the same manner. It has to go through notice and comment, which is – Yes, Your Honor. It has to go through – yes. Of course it does. It has to go through notice and comment. But what it does not require is the thorough review of the air quality criteria. And EPA itself has argued here that they think they have the authority – they have the power to revise and revisit a NAAQS standard without even reviewing the air quality criteria at all. And to Judge Childs' point, they have also said and acknowledged at multiple points that the air quality criteria is the scientific basis for the standards. So their contention here is that they have this independent authority to revise the standards at any time without even looking at the air quality criteria. That doesn't make any sense. That's a distinction. What do you mean independent authority? They're anchoring it in the second sentence. I'm sorry, Your Honor. They're claiming an independent authority. Independent of what? I'm sorry. They're claiming independent of the requirement to review, to do a thorough review.  And they're basing it on the second sentence. And they're basing it on the second sentence. They're not basing it on 109B. The second sentence, to your point, doesn't talk about revising standards. That's right, Your Honor. But what I was responding to, Judge Millett, is if you read 109B as a grant of the authority to revise existing standards, it does include a notice and comment requirement. But it does not require them to do a review or a thorough review of the air quality criteria. And as they have said themselves... Well, they didn't explain. I mean, part of their notice and comment process is going to be reasonably explaining, based on substantial evidence, why they're making this change. And the statute is pretty clear they're going to have to look to criteria. In fact, in this case, they did have some intervening criteria. But it also would allow the agency to do, as you said, we even implicitly allow agencies to go, whoops, either whoops, we completely misunderstood something, there's a health effect, a serious health effect that can be but is not being addressed, we just misgaged, miscalculated, or we have had intervening studies come in, in the last two years, that changed the calculus dramatically. And we need to promote health, which is our mission here. We need to impose a revised standard, not a new standard, I guess, a revised standard. And we don't think Congress wants us to wait three more years while people are dying. And they'll have to explain it. And people will challenge that and say whether they properly explained why they're doing this. Correct? So I don't understand. It's not some free-ranging authority to do whatever they want and make things up, disconnected from real evidence about health impacts. So I'm not sure I understand the concern to be. I mean, I think the reality of trying to say they have to do what they can't even do often in five-year intervals, in less than five-year intervals, and does everyone admit there's no evidence that they were even able to do that before Congress put this D-1 into the statute? And that just paralyzes the agency from reacting to new health information. So that's sort of our alternative reading. It reads the second sentence to become an empty letter because it is inadministrable. I think it's a recognition that when Congress required the thorough review in 1091, what it wanted to do was make sure that EPA was looking at all the available science and that one administration or the other was not simply choosing the scientific evidence that it thought was most relevant to the decision it wanted to make. That's how we understand the point of 1091 was Congress wanted to put that restriction on EPA to make sure that it looked at everything before. Once you've already done, you've just finished your five-year review. You have collected an awful lot of information. And then new information, and they all have to establish that it's credible and substantial evidence to support change, all those. But let's assume it passes all those markers. And it warrants immediate adjustment to an existing standard. There's no reason Congress would say you have to go revise and look at everything all over again. You just did it. You're working. You've got the baseline. And that baseline, the structure of the statute says that baseline holds for five years. But if you get new information on top of that, then you can revise the standard, revise the criteria, new standards. Yes, Your Honor. And I think you and I are in agreement that we're talking about the new information. I think when you do a new thorough review. On top of a baseline. You've got the baseline from this comprehensive review. This is like if you need to update your dissertation, you have to start all over again, do all your research again, and rewrite the entire dissertation. No one would say that. I don't think that's. You update it. I don't think that's how a thorough review would work, even in the five-year interval. I don't think you go back and throw out everything that was done. That would be a different thorough review than what you do in the first sentence. The second sentence thorough review would be a different review than. A thorough review. Right. So if we could sort of walk through how one of these things might work. So let's say you've done your five-year thorough review. And so you have your updated air quality criteria in light of whatever you did in 2000, just to pick a year. Right. And then new information comes out between 2000 and 2002. To do another thorough review doesn't mean you just throw all the work from 2000 in the trash can. Right. I mean, there's a document has been prepared. The evidence has been reviewed. And EPA doesn't have to redo a review of all the science that existed before 2000. It has to review the science from 2000 to 2002. But what the thorough review requires is that it look at all of the science from 2000 to 2002. That's just as simple. You can take care of that in notice and comment rulemaking challenges. If they ignored relevant evidence that's in the record of contrary science they didn't consider, that's a valid basis for challenges. That fits right within the notice and comment rulemaking limitation on revised standards. Your Honor, that's. As I read thorough review here, every five years, they have to look at all the criteria. Is that correct? They have to look at all the science for the air quality criteria. For all the criteria. All the science for all the criteria. At least since the prior one? Yes, Your Honor. Yes. All the science. Yes. But you're saying now if we take thorough review down into the second sentence, they don't have to review all the science for all the criteria. So thorough here means, it sounds like thorough in the first sentence has this comprehensiveness meaning. And the thorough you want in the second sentence has a target, a more colloquial meaning. No, no, I understand. I understand your question, Your Honor. No, I don't think it's different. Because I don't think even in the first sentence that it's requiring EPA to go back, I don't mean this pejoratively, right, but to the beginning of time and look at all that science again. I mean, I think. Right. There's been a lot of work that's been done. I'm not saying that. What I'm saying is the first sentence means thorough means not just diligent and hardworking.  But it means all the criteria. And, well, for our purposes, it means all of the science. No, no, no. In sentence one, again, tell me if I'm wrong. At five years, are they obligated to review information for all of the criteria, all of underlying NACs? Yes, Your Honor. Yes, every five years they are required to do that. So thorough there. I had read thorough there to mean comprehensive. All of the NACs, all of the criteria that underlie all of the existing NACs. Maybe if there's any new ones you're thinking about, too. That wouldn't be a review. That would be an initial look. You've surely got to review all of the criteria for all of the existing NACs. Certainly you can start with the prior five-year marker. But you've got to do all of them. So thorough here means not just hardworking. It means comprehensive. It does. Although that is not the point of dispute here. No, no. But then if you want to bring thorough down into the second sentence, they would only be able to review all of the criteria. When it says review and revise criteria, not criteria in singular. This is criteria plural. They would have to look at all of the criteria. Otherwise thorough is losing that comprehensive meaning in sentence one and becoming just the hardworking and diligent reading in sentence two. I think there's another reading of thorough review, which I think is the reading that everybody here agrees on. That's with respect to one particular criteria and one particular NAC. Thorough there, so say for this PM 2.5 in particular, it has its own criteria. I think the dispute between the parties is does thorough review require looking at all of the science that's developed since the last one for that particular criteria or not? EPA's position and admission here is that they did not look at all of the new science since the 2020 decision that they want to reconsider. What was your reading, your desire to take thorough down to the second sentence and to write in revised standards? What would that give you that you're not already going to get from notice and comment rulemaking and judicial review and arbitrary caputious substantial evidence standards under B1? I think the difference would be it would require EPA to go through all of the science. It would put it puts the burden on the agency to look at all of the science and not just impose a screening criteria, which is what they did here. They said here are the only studies that we're going to look at and only those studies. And that's what we think. What was the screening criteria? It's pretty lengthy, but I can point you to the to the page on the record. Give me a plain English summary. You don't need thorough for that. The EPA takes care of. Well, I think the problem with the difference that I think it's the same question, right? That the judgment is asking is what's the difference between an arbitrary and capricious review of their review? Right. Versus a requirement that they do a thorough review. And I think the difference is where does the where does the initial burden fall? I mean, they have to go out and look at all of the scientific evidence and actually lay eyes on it and reviewed and do an analysis and figure out how that applies. I'm sure it doesn't mean they can make some judgment as to whether there should be some sort of cracker box things out there. You don't have to look at everything or every single thesis written by everybody. So and the way this works, I mean, that's what they're supposed to do in their in their rulemakings under notice and comment and substantial evidence review. And then what what happens is parties come in and go, you missed one. You missed this one. And it's really important. This one, it's really important. They do have this obligation to to do good government work. But the whole point of notice and comment rulemaking is that we invite the public to help us and let us know if we missed anything. And so and you come. And so I don't I still don't understand how the outcome is going to be any different. Your I think the difference is that it puts the burden on on the public. If we haven't gone out and canvassed, we haven't found a particular study. They can say, well, those studies weren't brought to our attention. So here's what we here's what we can find. Now, if they say we chose only to look at, you know, PhD dissertations from Cambridge, then someone could go, well, that's not a reasonable restriction. But if they say, here's what we found. And we assume good faith by the agency. I assume you're not attacking that. And if they have an explicit, if you're concerned about some explicit criteria in here that limited you artificially limited the review, that's you don't even have to come back with a study, although it'd be helpful to show some prejudice from your illicited harm. But, you know, you can you can point out that what they did was arbitrary by by narrowly focusing the review. But if they've got everything they could find and you don't have any ideas of something they missed, then you're going to fail under either standard. So two answers, I have the site for you. It's 89 FEDRAG 16212. And that's where they set out the criteria for their admittedly less than thorough review. Admittedly less than thorough? Well, they say a number of times. Excuse me. Including the response to comments. So, first of all, they say in their brief. Page 30 EPA did not purport. Hang on. I'm sorry. I get to the right tab here. OK. All right. In their brief at page 30, they say, as industry petitioners note, in reviewing and revising the air quality criteria and standards in the final rule, EPA did not purport to complete the thorough review of all aspects of the air quality criteria. Right. It was focused on the health health concern. It focused on only certain science. And RTC. Certain science or certain problem. Certain science. And it gets to the criteria that I pointed to at 16212. At JA 2800, which is the response to comments, page 121, they say EPA acknowledges that the ISA supplement does not satisfy EPA's obligation to complete a thorough review. And that's just a legal argument. They weren't doing. Well, I think it's an admission that they didn't do the thorough review that they understand to be required by the statute. That if you were. If the way you could challenge what they did was. Challenge those notes and comment review of judicial review of their notice and comment process that you would not be able to make that exact same argument. And that there's anything that would prevent it from succeeding if you were to establish the materiality of the air. I think that there's a higher burden on them under this, this thing that would prevent you from prevailing on that exact same argument. Through judicial review of notice and comment rulemaking. We would have had to have found scientific studies, I think, to to explain why we think. The limitation is arbitrary and capricious. I think there's only the agency set up front there. There's something in their language that you think. Gives up the game right there. If not, if it was legal ease about, we're not doing 1st sentence, we're doing 2nd sentence. Or we're doing be 1, whichever right with legal ease and that's less concerning. But if you. Can't show some prejudice, I mean, either way you're coming to judicial review. On this, right? And so. I just, I don't understand what the, how the outcome will be materially different given that. Thoreau in the 2nd sentence sounds to me like it just means. They have to have considered all relevant. Evidence and studies. Right at the end of the day, that's what you're saying. No, no, one's arguing. They have to consider irrelevant or 1 off sort of crazy loony tune views. But if they've got, if there's, if they have to consider all relevant studies. And if you, even if they said, we've done thorough reviews, we can. Do you want to challenge it? You're going to have to find you're going to have to tell them and then you're going to have to tell the court. I mean, you're going to have to go through the same sort of process of alerting them through notice and comment rulemaking. And then challenging it in court. It's the exact same thing. Yes, your honor. I think if they had agreed, if they had, if they had agreed that they had a requirement. To do a thorough review, and our complaint would be that what they did was not sufficient. And it would be an arbitrary and capricious or substantial evidence type challenge to the quality of the thorough review that they did. But the claim that they have here is that they don't have to do a review at all. And we think that goes a step too far. And I think it comes back. That's how they did here. No, but, but that is the authority that they claim and it gets back to the 2nd sentence where they say, we have the authority under the 2nd sentence of 109 D1 to do a revision of existing. That standards without doing a review of air quality criteria at all. That didn't say they didn't say at all 41 page 41 to 42 of their brief. That is a quote record. Do they say at all? That's not that may be the lawyers. This is regarding the criteria preexisting criteria. Correct? Yes. Sure. I don't have to deal with that. Well, what the, what the statement in the brief is, is that we could revise the existing standards without review of the air quality criteria at all. Well, if they have new data, why not? Their, their assertion is that that is the, that is the power that the 2nd sentence of 109 D1 grants them. And so in this case, they, in fact, look at new information. They looked at some new information criteria. Yes. Yes. Your honor. They did. But again, you don't have to. Well, that's fine. We don't have to say they get everything they want in a brief. I mean, we're doing construction here, but where I was going before is, I think it comes back to and your honor, if you think it's important to consider the, the continued validity of that is something that I think the parties should brief. But I think that under established Supreme Court doctrine that this court has followed repeatedly, you have to hold the agency to the reasons that they have chosen the grounds. They have chosen to defend the rule on and the ground. They have chosen to defend the rule on here is that the 2nd sentence of 109 D1, that sentence alone grants them the power to revise the existing standards at any time without reviewing the air quality criteria at all. So, that is EPA's position. Your honor. I think we've had a very useful and interesting discussion about lots of other potential statutory bases. I don't think those changed the outcome here, but those are not the basis on which they have relied. They have not pointed to 109 B as a grant of authority. They have not tried to rely on the 1st sentence. 20 something times in their brief. Yes, but as many times agreed, but at page 30, they say, they talk about the 2nd sentence of section 109 D1 and they say, it is that authority on which EPA as an initial matter EPA here exercise the authority of the 2nd sentence of section 7409 D1. That's page 50, pages 29 to 30. The 2nd sentence of section 7409 D1 states that EPA may, and then it quotes the language. It was that authority that EPA relied on to revise the PM 2.5 standards. I think they're stuck with the choices that they make. We're talking about the existence of statutory authority. Because we also have harmless error. Right? If one, I know you, let's imagine that the 2nd sentence of D1 said exactly as you want to write it. They have the authority to revise criteria. We'll make it even easier for the purposes of this typo. Whenever they find it reasonably necessary to do so, but they must promulgate it in the same manner, or they must do so in the same manner it was originally promulgated. So, it's both authority, it could not be clear that it's both authority and process for you. And for some reason, they just never cited. Is it your position, given that we have harmless error analysis and given that we're in a love of bright world, it really doesn't matter how they read the statute. Your argument is that you want this rule vacated. Yes, your absence of statutory authority to be enacted. Your position is that even under that statute, I know we have a, there's a question about how to read D1. Your position is that they are stuck with what they argued. I have 2 answers for you on that. Your honor. Yeah. So, 1, I understand your honor. The theoretical argument as to why Chenery may not be good law after labor. I thought about it myself for some time, but again, I don't think that and I think if you want to go there, that would be opening a whole can of worms that I think the parties should have an opportunity to brief. But I think, as the law currently stands, they are stuck with the statutory authority that they cited. And then the 2nd argument is the harmless error. Your honor, the cleaner act has its own limitations on harmless error. 307 D9 says that harmless error under the cleaner act is limited to procedural errors and not issues of authority. So, I don't think you can apply that here. I hesitate to prolong this. The discussion of the 2nd sentence begins on page 29, where the agency says that basic principle, referring back to their argument about reconsideration, inherent authority to reconsider. We provide sufficient authority as it did here, but here EPA has more and that's the 2nd sentence. So, they're not relying solely on the 2nd sentence. They could be completely wrong about the 2nd sentence, and it would not matter if they have this or to reconsider. If they have the inherent authority, right? Which we, which we didn't, which I'm on the 2nd. Yes. Yes. You're trying to pin them on that in the sense of saying that that's what they rely on. That's their argument. Well, that's their alternative. So, so 2 answers to that, if I may, your honor, the 1st is they do say that, but then if you go on, if you turn the page to page 30, it says it was that authority that EPA relied on to revise the PM 2.5 standards. So, they do make, they do make the implicit authority argument. It's not that doesn't erase their whole discussion of. That's fair, your honor, which we've done, which we have not discussed at all, but I think that's probably just as well. Well, and if I could hear from the agents, you're on the implicit authority point. I think American methyl governs there. And it says that if you have a congressional statute that is capable of doing essentially what a reconsideration could do, then Congress says, that's a fair argument, but we haven't gotten into it. Thank you your honor real quick. The rule does quote 109B in the opening paragraph though. Yes, your honor, but it doesn't, it doesn't ever argue that that doesn't make the argument that 109B provides this authority and in the briefs, they clearly do not ever make that argument. And I think that you have to rely on the government's own on reading of the decisions that they've made. I think if they've chosen one statute or a provision over another. Oh, not of yes, not of how to read the statute. Of course, Loper says that that's for this court to determine. Thank you your honor. We'll give you some time for rebuttal after all this. Thank you your honors and may it please the court Jacob Abrahamson for the Commonwealth of Kentucky state petitioners. And acknowledging it failed to conduct a thorough review here. EPA lays bare the consequences of its interpretation of section 109D major regulatory decision. One that Congress designed to be driven by updated science is subject to quick reconsideration based on change judgments alone. I'd like to use the remainder of petitioners opening time to discuss why EPA failed to justify its decision to revise the NAAQS after this voluntary reconsideration. I think the best starting point is to work backwards from EPA's decision to place less weight on the uncertainties that were present in 2020 and ask whether that that explanation was reasoned under FCC. So. Again, the best starting point is on J.A. 237 final row page 16276. EPA makes clear that a lot of work is being done by its recognition that there are uncertainties and limitations, but judging that it's appropriate to place less weight on those uncertainties than the administrator placed on them. If they got new information, would that be unreasonable? Things are rarely perfectly certain in science, but if they got new information that reduced uncertainty, would that be unreasonable? In general, I think the answer is no. There's a world where new information that reduces uncertainty, it could be reasonable to rely on that information. If we read their decision as concluding that uncertainty had been reduced in a relevant amount. Then that would be permissible. I think under an arbitrary and capricious analysis that yes, it could be permissible, but we're disputing. And so the fight here is whether we read their decision as concluding that uncertainty was reduced in a materially relevant way that warranted a change in standards. That's what this debate is about? Yes, that's right. And so I think if we look to the specific, what new evidence EPA offered and the specific uncertainties that it dealt with, this court can look into whether its explanation was reasonable. The two pieces of new information that I think are doing the most work are new epidemiological studies that EPA added to its supplemental ISA here and new accountability studies. We also have to start from in 2020, the agency recognizing that it was itself uncertain whether the NAC that it was sticking with, retaining, was sufficient to protect public health. So that's the baseline we start from. That's part of the baseline we're starting from. We're even unsure in 2020. I'm sure the opposite way from what the outcome you want, which is like, we're not sure we should be sitting on the same number, but we're doing it for now. And then they come along with some more studies that strengthen the concern about health effects, morbidities, cardiovascular consequences. And I think that was irrational for them to act because. And I think the last part of what you said is where the heart of this debate is because in 2020, EPA looked at these studies and said that it pointed out that they cannot alone identify specific levels. There are increasing uncertainties at lower PM 2.5 concentrations. And here in 2024 at GA 210, it identified the same basic uncertainties. And as a way of resolving them, I think it did look to two places to do most of the work. That's by adding. There's no rule to eliminate uncertainty to be reasonable. We said that would be impossible. Yeah, of course not. I don't think that would be impossible. So the question is really. The question is whether the uncertainties in 2024 are different than the uncertainties that were present in 2020. And we submitted that the uncertainties here. We're not we're not different. And that you agree that there were additional studies that further documented the risk and showed that a different standard. I mean, the part of the whole thing and found out that a different next the way they have always calculated, which next standard to adopt a reasonable margin of safety. But they had new new dots on the chart and that changed which one was now the one from which the referral point for setting the standard. Well, so haven't attacked that study or any of these studies they considered as irrational or unreasonable or improper considerations. No, you're right. Just just the way that you can relied on them here. Relied on them in any way that it hasn't always relied on standards and that is on these. Sorry. Excuse me studies. And that is to gain the information you find reasons studies and you plot out sort of where their numbers are where these studies are setting the causal air quality standard. And then they work from the lowest from the lowest one and sort of round down a little bit. Well, that's not the approach that EPA took in 2020, because what I understand that, but that's what they've done every other time. Yes. But I think that when it's when they've done every time except 2020, when they recognize they were certain, but it really should be sticking with number. And I think that this isn't like every other time, because this is a reconsideration and it's not simply. You know, I think when we look to cases like the Mississippi case, I mean, this court has several cases and that are after a thorough next review EPA. I don't want to say a clean slate, but it's certainly working from a new slate and that it's conducted this full thorough review. And I think this court rightly defers in that situation and says EPA's obligation when it's simply revising on the on the schedule that section one on ninety one sets out doesn't have to also do the work of finding every problem with the last next that it set. But when EPA is is revising, I think it does it doesn't raise the bar, but it requires EPA to answer the question of why what they got wrong the last time around. And part of what they wrong. This is not a question of wrong. This is a question of we made one decision based on information we have. And now we have new information and that changes decision. That doesn't mean the prior one was wrong. We face it. He makes decisions often on records presented to us that different records might require different outcomes. But that's just how the system works. Yeah, and I thought that was that was not the not the right word to use. I should say that it has to. Outdated. Outdated or simply, yeah, outdated is, is, I think, the right word, Your Honor. And then and what EPA did in twenty twenty was acknowledged to be outdated or it's just that the there's a higher volume of different information. I think the problem here is that there was not a higher value. Whether they have to find it was outdated or they simply have to find that we now have a higher volume of information point in another direction. I think that could be another another reason to. All right. Thank you very much. Thank you. Otherwise, I'm going to feel outdated. The. Good morning, Your Honor. Sarah Buckley for EPA. I'll be addressing parts one and two of our brief, which encompass EPA's authority to revise the standards as it did here and its lack of authority to consider costs and related factors. My colleague, Miss St. Romain will then address parts three and four, which encompass the record support for the change with us at council table. It's David Orland of EPA's Office of General Counsel. So, starting with authority, I think that our disagreement with petitioners boils down to this. What is subsection D1 meant to do? In our view, D1 instructs EPA to regularly canvass the science and then to update its criteria and revise its standards consistent with that science. That's the first sentence in the interim. However, if EPA has reason to update its criteria or revise its standards, it certainly may do so. That's the second. Hang on. Yes. So, the second sentence is you can certainly review and revise your criteria. But it doesn't say revised standards. B1 says that. Can you tell me why I'm wrong to think that you have the authority under B1 to revise standards as long as you go through the notice and comment rulemaking? Absolutely, Your Honor. I think, one, I think you are correct to read B1 as indicating that Congress conferred that authority. Indicating or stating? Stating, Your Honor. Those are different things. Do you think the authority is only implicit? No, Your Honor. It may be revised as anything other than authority, but I'm being told that nobody else reads it that way. No, Your Honor. I think, I think it's useful to look at that and note that it does state that EPA may revise in the same manner promulgated, as promulgated. So, if you have authority under sentence 2 to review and revise criteria and say that disclosed a need to make a change for health purposes, then you would go to, you would need some authority to do that revision. You could go to B1, Your Honor, but I would say EPA's action here is also properly invoking B1, and I think I'll try to cut right to this promulgate new standard issue. I think the best way to read what EPA did here in revising the standard was that it was promulgating a new standard. I think you can see that by looking at the header of D, which explicitly says it is about reviewing and revision of criteria and standards. Was that heading part of the statute itself, or was it added by the codifier? Is it part of the public law? That is a good question, Your Honor. I don't have the answer to that, but I'd be happy to follow up on that. The other way, the other way that we know that what EPA did here was promulgating a new standard in revising the suite of standards that apply to particulate matter is that the former standard, the then operative standard from 2013, still resides in the CFR. The 2013 standard still is at 40 CFR 50.18. The new standard for 2024 is at 40 CFR 50.20. The new standard catalyzes the whole attainment and implementation process to meet that new standard, but the attainment obligations for the old standard remain. So if any states or localities have not yet attained 2013, they may still have obligations to continue to put control measures directed at that standard, even as they have new obligations by the state. So a new standard, as you're using the term, can be just an updated standard. It doesn't have to be the first time this criteria pollutants has been regulated. Yes, Your Honor. And I think another reason to think that is, again, new standards are governed by subsection A of 109. And not only are they governed by subsection A of 109, but I think as Mr. Lynn pointed out, EPA would have to go through a whole process of 108 to designate air quality criteria for a new pollutant before it could be promulgating an air quality standard for that pollutant. So I think it's instructive to look back at the statutory history as you were doing, Judge Millett, and note that, yes, prior to 1977, D1 didn't exist. We had A and we had B that had that same sentence, such primary standards may be revised in the same manner as promulgated. So when Congress added D1, what do we think Congress was doing? There's been so much briefing about implicit authority, I'm just confused as to why that's all there, if reading D1 is explicit. I think that perhaps all of the parties got a little rapture on the axle of subsection D, because that is the argument that was raised in comments and is raised here. The argument that we understand petitioners to have been making was that the existence of D displaces authority. And so we focused our briefing on explaining, no, this is not displacing any authority. It's not a proper way to read that text. And also, not only does the first sentence of D1 not displace it, we have the second sentence in there that's Congress saying, don't read the requirement in the first sentence to prohibit your action more frequently. Can you read the second sentence as being essentially a license to proceed without a thorough review? Yes, Your Honor. What kind of a review is that? Somewhere between thorough and slapdash, what is it? Right, I think that is not fair to characterize what EPA did here or the authority that EPA thinks it has is to revise standards in the slapdash fashion. Perhaps making more concrete what EPA thinks a thorough review is could be helpful. When EPA undertakes a thorough review, it starts by canvassing all of the databases of scientific literature, searching for evidence on all of the different health effects that are covered in the criteria. And it's just revising a standard without going through a thorough review, then what? Well, and so then that creates the document, the integrated science assessment. That's the embodiment of the air quality criteria. When it then makes a decision whether to revise a standard, it has to go and review that document. And that's what EPA did here. The requirement to go and review that document is found in 109B1 itself that says that the standards have to be based on the air quality criteria. EPA here explicitly said that it was basing its action here on the thorough review of air quality criteria completed in 2020 as supplemented in 2022. And that's at JA 164 and 173 in the preamble and also in the response to comments in 2018. So the thorough review took place at the criteria level, right? Yes. And the standard derived from that, when being revised, can relate back to, can reread, let's say, the criteria document in any new studies without a thorough review of that criteria. Yes, Your Honor. I think a way to think about this is every five years, EPA has to publish a new edition of the criteria. In the interim, if there is a significant new development, they were talking about a casebook and Loper-Bright comes down, you can go in and revise that chapter on Chevron, and you don't have to canvass all of the other chapters. I'm sorry? This is the pocket part? This is the pocket part, yes. Recall back to law school. And that is what EPA did here. There was, in reviewing and going and initiating a review proceeding to determine whether the standards did indeed meet the health standard of B1, EPA was aware that there was new science on the health effects that EPA found had the most strong causal linkage to exposure to particulate matter. And so it did a mini thorough review, one might say. It went and it canvassed that scientific literature for anything new on the mortality and cardiovascular. That's not a review of the criteria. It's reviewing the underlying science. So, yes. So, EPA went, looked back at the record, said, we're not sure that this standard is requisite to protect public health with an adequate margin of safety. We would like to initiate a proceeding to potentially reconsider that. At the outset of that proceeding, EPA said, well, our air quality criteria and our 2020 policy decision to retain really turned on these particular health effects. And we've been told by petitioners who have filed petitions for reconsideration that there's new studies on this very important health effect. The reconsideration was of the criteria document, not of the standard? I suppose it was a reconsideration of the standard. And in the course of that proceeding, the criteria document was revised by the issuance of the supplement. Yes, Your Honor. And EPA focused its review on those health effects between reconsideration and revised. I don't think there is a difference, Your Honor. I think that if, again, we're getting really stuck on this term reconsideration as if it comes with technical meaning, and I'm not sure that it does. If EPA had said, we're going to look back at our decision, determine whether it's meeting the text chart. Review instead of reconsideration. Review. You do have the authority to review. Yes, Your Honor. Is there a difference between review and reconsider? Sometimes you're going to do review and revise. Somewhere in there, after you review it, you decide to reconsider by revising it. Right. I think that... You put another dog on the table when you talk about reconsideration. Because neither review nor revise. I suppose that it is a different word, Your Honor, but it results in the same proceeding as reviewing and then revising. Again, I don't think that putting a lot of technical import... Both review and revise. Is umbrella word for review and revise? Umbrella word for... I think it's an umbrella word for EPA believing that a decision may have been wrong and wanting to begin... I mean, the only way they're going to figure out it's wrong, they've got to go back and review.  And that review presumably will inform decision revise. Yes. So together, that's just how courts think about reconsideration. Yes. I think that's spot on. Umbrella term for review and revise. I'm trying to figure out whether you're claiming an additional power or whether it's just... You're using it as an umbrella term for review and revise. Using an umbrella term, Your Honor. Not claiming an independent power here. The power is all derived from 109. You don't think there's anything more than review and revise? No, Your Honor. Then the distinction between promulgating new standards and revising existing standards. What is your distinction there? I don't have a black and white answer on that. And obviously, the lawyer never wants to say that the presumption of circularity is just a presumption. But I don't see anywhere else in the statute that Congress has given different import to revise standards versus promulgate new standards. It could be that a more minor change to standards would constitute a revision and a more significant change would constitute new standards. But again, I think here the best way to look at what EPA did was it created a new standard that states now have to comply with. That states now have to develop plans to implement after attainment designations are made. Is there a difference between describing it that way and saying you revised the existing standard? What's the difference between saying we created a new standard and we revised the existing standard to increase the obligation? Beyond that word, Your Honor, I don't think there is. I suppose EPA could have, but notably did not here, actually reach back into that CFR and, you know, non-proton change the standard that was applicable at some earlier point. But that's not what EPA did here. The standard is applicable, you know, starting in... I don't think there's any argument that this is a forward-looking rule. That would be a whole different problem. And you've given consideration before to actually revising standards, but have you used the word reconsideration during those times? In previous proceedings, EPA has announced that it would reconsider standards, although it has never finalized a reconsideration by revising. It has, however, frequently reopened air quality criteria and then revised the air quality criteria. And the point of my question is to think about the consistency of your term. You know, just as a through line through prior practices. Right. Right. EPA has consistently used the term reconsideration not to have some independent meeting, but to prompt or invoke its authority, a proceeding under 109B, 109D. That's helpful. I'm going to ask a question which I've never asked in 38 years on the bench, but I'm driven to it by despair. Is there any legislative history on this? Oh, there certainly is, Your Honor. Not very lengthy, but I will say this. Initially, 109D.1 was in the House bill that became the 1977 amendments. The House bill's version, which petitioners cite in a footnote of their brief, actually called for a review and revision every two years. In the conference, though, the Senate didn't have a comparable version. In the conference, the Senate stated the following, or the conference report states the following. The Senate concurs in the House amendments with the following modification. The first review shall be completed in 1980. Subsequent reviews are required every five years. But the administrator is authorized to conduct review of existing ambient standards more frequently than every five years, and is expected to revise standards whenever available information justifies a revision. More coherent than the statute. Indeed. And honestly, Your Honor, the fact that that second sentence was added in the conference might also explain this disconnect between the revision. It's a mess. Yes. I think what that shows is that the House was pushing towards very frequent updates and reviews, again, to make sure that these standards are doing their job of focusing our regulatory efforts at protecting public health. The Senate said, we can slow that down, but we are not trying to displace EPA's ability to respond to new information and ensure that our standards are meeting the public health standards set out in D1. Is there legislative history for the second sentence in D1? Not that I'm aware of, Your Honor. I would like to just quickly address the cost argument and note that the cost argument and the attainability argument is really focused on this idea that there's an analytical distinction between the decision whether to revise the standards and what level to revise the standards to. And I think that analytical distinction is a mirage. Because if you're ever considering whether to retain a standard, you're necessarily asking yourself the question, is this standard meeting the statutory standard? Is this standard requisite to protect public health with an adequate margin of safety? And at that point, you're considering the level of the standard and you're engaged in precisely the forbidden exercise that the precedents of this court and the Supreme Court have said that we can't do. And besides that, I'll note that this court in American Trucking Association 1 recognized that there is no analytical distinction between promulgation of standards under B1 or D1. A ground on which we were not reversed. Exactly, Your Honor. My colleagues have no further questions? Thank you. I'll turn the podium over to Ms. Dingerman. Good morning, Your Honors. I may please the court Alex St. Hermain on behalf of EPA. Today I will address petitioner's record-based arguments covered in sections 3 and 4 of our brief. So at issue today is whether the EPA administrator reasonably determined that a 9 microgram per cubic meter standard for primary annual PM 2.5 was requisite to protect the public health. And the answer to that question is a resounding yes. The at issue criteria, which is comprised of both the 2019 science assessment and the 2022 supplement, demonstrate consistently strong linkages between PM 2.5 concentrations well below 12 micrograms per cubic meter and negative health effects like mortality, cardiovascular effects, respiratory effects, cancer, and nervous system effects. Why did the agency choose not to look at some other health effects like on reproductive? Yeah, the reason the agency chose to limit the health effects of looking at in the 2022 supplement is that it looked at the health effects that drove the EPA's staff level conclusion in 2019, which was a conclusion that the science called into question the adequacy of the standard. The health effects that EPA focused on were those where EPA had the strongest evidence that there was a clear linkage between those health effects and PM 2.5 concentration. And other health effects like respiratory effects, the linkage between PM 2.5 exposure and those health effects is a bit weaker. Do we need to resolve that the science has actually changed in order for you to get to a revision? No, your honor. And that's for 2 reasons. 1st, is that the statute says that whether a standard is requisite to protect the public health with an adequate margin of safety is left with the determination that's left to the judgment of the administrator. And that means that different administrators could reach different conclusions based on the same evidence. And that is aligned with this court's conclusions in Mississippi and in Murray Energy. In those cases, petitioners were arguing that there was a presumption of validity given to EPA's past standards. And this court rejected that presumption and explained that such a presumption would result in a situation where EPA is bound by flaws or errors in past standards. And instead, the question before the court is the one I started with today. Is EPA's decision here reasonable? Now, I will say that this wasn't a situation where EPA was just looking at the same record and reaching a completely different result. EPA explained that there were clear differences between the 2020 record and here that prompted its decision to revise the standard. EPA explained, and this is at J237 in the preamble, how uncertainties changed. And the fact that uncertainties changed decreased the magnitude of uncertainties and increased the administrator's confidence in the results of the epidemiologic studies. The uncertainties changed in 2 main ways. So, 1st, there were additional studies that controlled for confounding factors. Now, these studies that controlled for confounding factors, they, so let's use an example because I think this is particularly helpful. So, 1 health effect that has a strong linkage to PM2.5 exposure is cardiovascular effects. So, we all know that cardiovascular effects like heart attacks can cause, can be caused by PM2.5 concentration or can be caused by lifestyle, smoking, underlying health conditions. These new studies in the 2022 supplement controlled for those confounding factors, took them into consideration, and still showed very strong linkages between PM2.5 concentrations and cardiovascular effects like heart attacks. And that gave the administrator confidence, the administrator explained, in the results of the epidemiologic studies. Another big change between this record and this, the 2022 supplement and the 2019 criteria document were the addition of new accountability studies. Now, accountability studies are those studies that look at a policy intervention that decreases PM2.5 concentrations to see if PM2.5 associated health effects also decrease. We provided an example in our brief of replacing manual toll booths with easy pass toll booths, but to provide an example that was in the 2022 supplement, there was 1 study that looked at the effect of retiring power plants. And this study showed that when the power plants retired, PM2.5 concentrations in that area decreased from around 10 micrograms to around 7 micrograms. And with that decrease, there was also a decrease in hospitalizations resulting from cardiovascular illness. So, again, these sorts of studies gave the administrator more confidence in the results of the epidemiologic studies. Just thinking about a question asked of your co-counsel earlier, EPA has revised criteria off cycle, but then chose not to revise the standards. What's the reason for that? You know, I think that ultimately what that tells us is that EPA's decision to reopen criteria and consider whether it's appropriate to revise standards is not predetermined. EPA, as we note at page 80 of our brief, on at least half a dozen occasions since the Cleaner Act was amended, EPA has gone about reopening the criteria in the exact same manner as it did here for the exact same reason. It's presented with new information that's sufficiently important to the administrator's determination of whether the current standard is requisite to protect public health. And the administrator reopens the criteria, or the EPA reopens the criteria, so that KSAC, the public, and ultimately the administrator can consider that new science in determining whether the standard is, in fact, requisite to protect the public health. Have you done a thorough review in those cases? In most of those cases, EPA has recently done a thorough review or is in the middle of a thorough review and has completed its criteria document. So, in those cases, they're really aligned with this case where EPA just reviewed all of the relevant science, but it's presented with new, particularly important science that it thinks it should consider in determining whether the standard is requisite. I see my time is up. In some, EPA's decision to revise the primary annual PM 2.5 standard to 9 micrograms was reasonable and supported by the robust record evidence. For this reason, and those discussed in our brief, we respectfully request that you deny the position for review. Thank you. Mr. Lenz, you're doing rebuttal for both petitioners, and we'll give you three minutes. Your Honor, I think… Oh, I'm sorry. I apologize. Thank you. Good morning, Your Honors. Jonathan Wiener for State Intervenors. I'd like to take a step back and try to address the dogs on the table for some of them. Dogs on the table? Maybe I misheard. Yes, reconsideration. Yes, the issue of what we are calling what EPA did here. I think the easiest way of thinking about it is what EPA reconsidered is its decision in 2020 to leave the standards in place, then revised the PM NACS standards generally and did so by setting a new standard. As my co-counsel explained, whatever term we are using, EPA has authority to do that, to take the action that it took here. And it's well recognized that EPA has reconsideration authority for its Clean Air Act rules. As this court said in Clean Air Council, 109B makes clear that EPA has authority to revise NACS standards, and 109D makes clear that it has authority to promulgate new standards. Section 109D is not a roadblock to what EPA did here, and I think there's been a lot of discussion about that. I just wanted to point out one more, I think, important textual reason that's true, and that's the word and in the first sentence. So, when EPA is conducting a thorough review required by the first sentence, it's a thorough review of criteria and standards together. The second sentence does not say criteria and standards. It says review and revise criteria or promulgate new standards. So, what that means is that EPA can promulgate a new standard without reopening every aspect of the criteria, including aspects of the criteria that may not be relevant to the standard in question. And I do want to point out that this is not – what EPA has done here is not novel. It has reconsidered its NACS standards in the past. We pointed out some examples in our brief. This is not unlimited. EPA cannot ignore the previous criteria when it is setting a new standard. It has to look at them, and we – I want to provide a couple of quick citations to examples from here where – examples from the 2020 record that made – we think made clear that EPA needed to reconsider, and that's the draft – sorry, the policy assessment from 2020 and the independent particular matter review panel. And I think the last thing I wanted to point out is that there's no Chenery problem here, and that's because whatever we are calling what EPA did, EPA has relied on all of these authorities in its rulemaking. And if I can just point out some places in the JA-2797 and 2801, this is in the response to comments document. EPA relies on its general and implicit authority to set and revise – to revise NACS standards. In the same document at JA-2799, it invokes 109B for authority to revise NACS standards. What about the state's reliance interest? Does that five-year cycle just kind of generally intend that they expect that there will be no revision? That's EPA's position. I don't think you need to reach that here because the petitioners haven't identified any reliance interests tied to the 2020 decision. And under the Solonix case, EPA is not required to review those. And then what's your position with the harmless error argument? Because you had that as kind of an independent argument. I think there are a couple different harmless errors that this court can rule on. No, I don't think you need to reach the argument that is in our brief that the – you know, basically had EPA said petition granted somewhere in its preamble about our petitions for reconsideration, that all this would be beside the point because everything would have turned out the same. You don't need to address that. There are plenty of other harmless errors here that have already been discussed, including that petitioners had many, many opportunities to point to things that EPA didn't look at or should have considered and didn't. There were many notice and comment opportunities. There were – and in the briefing, in the comments, and today, nobody has said there was something that EPA missed or something that EPA ignored that would have changed the outcome. And again, whatever EPA called what it was doing here, it had authority to do it. So take your pick of the harmless errors, I think. Thank you very much, counsel. I apologize. Thank you. Now, Mr. Lynn, you may have three minutes. Okay. My question is, is counsel correct that when you say you're concerned about their limiting, as counsel has said, concerned about the agency not doing a thorough review that they've left some science out, do you have anything they left out that's been harmful? Or this is really that you wanted them to do the first dig? Sure. So I can point you to a couple studies. If I could just find it in my notes. Submitted in the record? It's not in the JA, but it is in the underlying agency record. Okay. And so it's... If you look at the gradient comments, I can read you the site. You probably need it. EPA HQ ORD, there's a bunch of numbers, 2014-0859-0077. At page six, two studies were discussed, the Goodman study and the Zoo study, in response to the ISA, draft ISA supplement. There was no response to those studies as to why they didn't consider them. Now, we don't think, Your Honor, that... I would argue those are in your brief here. Those haven't been raised by anything. We didn't point to those specifically. Any petitioners? No, not in the briefs. And the reason is because we don't, as we've discussed already, Your Honor, we don't think that there should be a prejudice or harmless error analysis here, both because 307-D9 doesn't permit it. You can only look at procedural harmless errors. But also because, as we've discussed, the authority that they claim here is not... Again, they're not saying we acted under the first sentence. We were required to do a thorough review. What we did was good enough to survive arbitration capricious. Their argument is we didn't have to do it at all. That's the question that's before this court. I did have a couple quick points that I wanted to get to. I think the first is that my friend from the government's argument eviscerates the distinction between revising existing standards and promulgating new standards. I don't think she offered an example of what revising an existing standard would be. I think under her argument, everything would be promulgating new standards. If you look at Section 109, it uses the two different words. So talk about two different things. Promulgation is always used with respect to new standards for pollutants that don't already have a standard. That's 109A. That's, Your Honor, the 109B that we've talked about, right, which says they revise in a manner that is the same as the standard was promulgated. Those words have to have meaning. They're different words. The second point I wanted to make... I'm sorry. I will let you make your second point, I promise. Do we know if promulgate new standards is used elsewhere in the 109 Act? Or is this really the only place we would look at? I don't know that off the top of my head. But I do think, I mean, I think when it says not only promulgate, it says promulgate new standards. I think it might be different if it just said promulgate standards, but it specifically says promulgate new standards. I'm sorry, your second point. So I had just three really quick points. The second is that, Your Honor, you extended the invitation to the government to rely on B1. I don't think she accepted it or pointed to a place in the record where they made that argument. They are relying on D1 and implicit authority, Judge Ginsburg, for what they have done here. And I don't think either of those holds up. On the question of whether to reconsider and how to reconsider as to whether that's a mirage, I don't think it's a mirage to say that there's two different steps in a reconsideration. I think just as an example, if you look at 307 D7, which is the standard in the Clean Air Act for mandatory reconsideration, that sets forth specific things that you look at to determine whether to reconsider. And then as this court recognized in Clean Air Act, Clean Air Council versus Pruitt, it's a separate question as to how you reconsider. So I don't think that we have a debate over whether costs should go into the first part or not. But I think the principle that there's a distinct, that there's a two-step process, I don't think that that's made up. And then finally, Judge Ginsburg, on the legislative history, there's very little. And as my friend pointed out, I do think it's ambiguous at best. I mean, it says that they should revise as justified, but that doesn't address whether the thorough review requirement applies before you do the revision. Thank you very much.
judges: Millett; Childs; Ginsburg